## J. A. DURKEE *et al.* v. W. C. GUNN.

PARTNERSHIP — *Dissolution* — *Notice to one Partner.* Quotations made from the testimony, and thereon *held,* that they fully sustain the findings of the trial court, and also show that the plaintiffs in error had knowledge of the dissolution of the firm of G. & M., and recognized the transaction whereby G. assumed and carried on the business of the old firm; and *further held,* that the foregoing extracts show that D., of the firm of D. & S., had personal knowledge of the notices and advertisements published by G. in relation to the sale of the land belonging to D. & S. Notice to one partner of the firm is notice to all.

*Motion for Rehearing.*

THE plaintiffs in error filed a motion for a rehearing, which the court denied at its session in July, 1889, and then filed the opinion, *infra.*

*J. D. McCleverty,* for plaintiffs in error.

*Ware, Biddle & Cory,* for defendant in error.

*Per Curiam:* Upon the presentation of the motion for a rehearing in this case, some of the findings of the trial court were questioned, and it was also asserted that the evidence in the case did not show that Durkee & Stout had personal notice of the dissolution of the firm of Gunn & Marr, and that Gunn was to carry on the business of the old firm the same as if the firm had not dissolved. We therefore make the following quotations from the testimony. W. C. Gunn testified:

"Q. What business are you engaged in? A. Real-estate business.

"Q. How long have you been engaged in that business? A. About ten years.

"Q. During all that time what experience have you had in real-estate business as compared with others in the city of Fort Scott — others in real-estate business? A. Well I suppose I have laid out as many additions as all the rest together, pretty nearly — at least until within the last three or four months — since I have been in the business.

"Q. Have you been largely engaged in the real-estate business? A. Yes, sir.

"Q. If at any time real estate began to improve, you may state when that took place. A. Well, from the first of January on to the middle of January, I guess, before it took any change.

"Q. If you did anything looking toward carrying out the advertising of the land in question, and the agreements contained in the contract, you may state fully and in detail what you did. A. We advertised in the papers as Gunn & Marr, and after I took the firm business I advertised that business as W. C. Gunn.

"Q. In the first place, did you plat the addition? A. Yes, sir; we had Mr. Fortney survey and plat the addition; Mr. Fortney is the county surveyor.

"Q. I will ask you about that plat: where did you last see that plat? A. I gave it to Mr. Durkee, the last I saw of it, to sign.

"Q. Please state in detail in regard to the survey and making of that plat. A. We had it surveyed and platted sometime in June; consulted with Messrs. Durkee & Stout, and agreed what prices we would put on the lots to sell them at.

"Q. The prices were agreed to on the lots between you and Mr. Durkee and Mr. Stout? A. Yes, sir.

"Q. What did you call that addition? A. Durkee & Stout's addition to the city of Fort Scott.

"Q. Did you cause that addition to be advertised in the newspapers? A. Yes, sir.

"Q. Did you do anything personally toward giving it publicity and promoting the sale of the lots? A. Yes, sir, we did all we could; and then we started a boom that we got up there for the benefit of that property and the benefit of other property there that we had for sale.

"Q. What do you call a boom as applied to real estate? A. Well, that is getting up a little excitement for the benefit of the people, to let them see what a good town we have got, and get them to take hold and buy real estate.

"Q. What did you do to increase the market value and promote the sale of this property? A. Well, I signed $300 for the purpose, and the rest of the real-estate agents called a meeting, and we all got up a subscription and raised what money we could, and gave it to the papers, to show to the pub-

lic, and show what a good town we had; to write it up and keep up the feeling and boom the town.

"Q. Did you employ a special writer for the purpose? A. Yes, sir; we employed J. M. Galloway, besides others among us, to write for the papers.

"Q. When did you begin that process you call 'booming' the town'? A. Right away after I got that contract—and agreed to do that if I got the contract.

"Q. That is, you promised that to Durkee & Stout? A. Yes, sir.

"Q. As compared with the balance of the real-estate agents in the city, what proportion did the firm of Gunn & Marr sign toward this boom? A. We subscribed more than anybody else; I am sure of that."

NOTICE TO DURKEE & STOUT OF DISSOLUTION.

"Q. You say the dissolution of partnership took place on the 23d of July, 1886? A. Yes, sir.

"Q. Up to that time what had been the respective duties in your firm of yourself and Mr. Marr, as specially directed toward handling your real estate? A. Mr. Marr didn't sell real estate; he was the inside man; I did the selling—the outside work; did nearly all the managing of buying and selling, and the like of that. He tended the books and the inside work.

"Q. After the dissolution of the firm of Gunn & Marr, was the Durkee & Stout addition still advertised for sale? A. Yes, sir; it was advertised by W. C. Gunn—myself individually.

"Q. Did the firm of Durkee & Stout know of the dissolution of the firm of Gunn & Marr? A. Yes, sir.

"Q. How do you know? A. Why, I had talked with Mr. Stout about it once just in a friendly way two or three days after the dissolution.

"Q. What did he ask? A. I don't remember the exact words, but he wanted to know why we dissolved; I told him.

"Q. What were your relations, (you and Mr. Stout,) at that time? A. Same as now; we have always been the best of friends.

"Q. If, in that conversation which you had, about the time of the dissolution, with Mr. Stout, anything was said about to whom the real estate was turned over, you may state. A. I told him Marr had gone out of the business; that I had assumed the business and a portion of the debts, and taken all the business; I thought perhaps Mr. Marr was going to Kan-

sas City; I thought maybe he would, but he didn't know yet what he would do."

### THE STARTING OF THE SECOND BOOM.

"Q. Do you mean that was the beginning of the boom, or that that was the beginning of the effort to start the boom? A. Well, it was along about the 1st of January when they made the first effort.

"Q. What did you do? A. We got together and formed a stock company to raise $120,000, and get it subscribed by the citizens. Col. Pearsall and I got nearly all the subscriptions, and we canvassed the town and got nearly all the stock taken, and platted the 'South Side Park addition,' and wrote to Kansas City to show the people what a good town it was.

"Q. What effect did it have upon the town? A. Well, it doubled the value of property in and around town, I think I may safely say, from what it would have sold for before that boom, and three times, some of it; some of it as high as four times.

"Q. To what extent were the sales of real estate in and around Fort Scott increased by this second boom? A. Oh, it is hard to say; but I suppose there were five hundred times as many sales — yes, a thousand — in three or four months after the 1st of January as there were in any other three or four months since I have been here. Maybe that is a pretty big assertion, but it was a great increase.

"Q. To what cause was this increase in real estate in 1887 due? A. In my judgment it was due to this syndicate, the way we managed the sales, the advertising and everything.

"Q. What did you do toward organizing and perfecting this syndicate? A. I was one of the directors; I was present at the first meeting and every other meeting; Col. Pearsall and I did everything to get the stock taken; I did everything I could to get it taken; it was the biggest job of my life.

"Q. The biggest job of your life? A. The hardest one."

### SALES MADE.

"Q. Did you have any talk at any time — yourself personally — with either Mr. Durkee or Mr. Stout in regard to withdrawing it from the market? A. There never was a word said to me until just before this suit was brought.

"Q. Did you ever withdraw it from the market and refuse to sell any of it? A. No, sir.

"Q. If after the first of January you actually made any sale of any of the lots in this Durkee & Stout addition, you

may say about when it was. A. Yes; I sold three of the lots to Mr. Marr; and I sold one of the lots to Mrs. McCleverty.

"Q. About what time did you sell one of the lots to Mrs. McCleverty? A. I guess about the first of February; I can tell from my books.

"Q. Was there any money paid down? A. $300. I made a written contract; took the money and gave her our receipt."

GUNN REPORTS TO DURKEE & STOUT HIS ACTIONS.

"Q. Did you have any talk with Mr. Stout immediately after making that contract, as to whether or not it was satisfactory to him? A. I went over and reported to Mr. Stout; he said it was a satisfactory sale; I told him how I had sold it, and the terms. That was at his office, the office of Durkee & Stout in this city.

"Q. Did you have any talk with Mr. Durkee at or about the time you were organizing the second boom in regard to syndicate stock? A. We tried to get Mr. Durkee to take some stock for Durkee & Stout. Mr. Pearsall and I saw Durkee and wanted to know if he was willing to put the land in. He said he was willing to put it in at $12,000; he was willing to put it in at $12,000, but he was not willing to take any stock. He wanted $12,000 for what was left; some of it was sold. I wanted Durkee & Stout to take some of the stock.

"Q. You may state whether or not before that time defendants had refused further to carry out their contract; to proceed further under this contract. A. They never did refuse, or show any disposition to refuse, up to this time that Mr. Stout got back, along about the middle or last of January.

"Q. Did they refuse then? A. Yes, he refused. After that I saw him in regard to the sale to Mrs. McCleverty, the same day. He refused to take the money, though he had said the sale was satisfactory, an hour or two before that.

"Q. When you saw this plat, what conversation took place? A. I said to Mr. Stout he was changing the plat without consulting me; and I supposed he intended me to sue him. He said he supposed that was what I would have to do; or something to that effect."

CONVERSATION WITH GUNN AND STOUT.

"If afterward you sold any of this property, you may state when and to whom. A. About the sales: There was another sale he made to Mr. Tierman. There was a part of the ground

left, about eleven acres on the south side, that he, I believe, gave Mr. Tierman an option on at $750 an acre; and I went to see him about it, and said I was very much dissatisfied. It wasn't anything like what it was worth; we could get a great deal more out of it. We talked over the matter half an hour. He argued that the sale ought to be made; that it was a great price, and if the boom went down that he would have enough sold to pay for the land; and I claimed that we could get a good deal more for it, perhaps twice that much. I objected to selling it; but as long as it was his money I consented, but didn't want to sell any more that cheap. That was along the first days of February."

Mr. Pearsall testified:

"Q. If you heard Mr. Durkee say anything in Mr. Gunn's presence in regard to that land and the contract of Gunn's in regard to that land and the value of the land, you may state. A. I think all I ever heard Durkee say about it was when we asked him to subscribe to the stock. He objected to subscribing stock, on the ground of the street railroad being taken into the deal. He said he was willing that the land should go in; but he wouldn't subscribe any stock until Mr. Stout returned. And he said, 'Mr. Gunn, I am willing the land should go in, if you are willing it should go in.' I knew Mr. Gunn had a contract; because he had told me about it. That was the last we heard in regard to it. Just before we succeeded in getting up all the stock, Mr. Durkee objected to subscribing stock. I think it was right there by Hanna's livery stable. I think Gunn did all the talking. The ground on which he objected was because we had the street railway in; and he said it looked like a scheme to unload the street railway. But he was willing to let the land go in; but he wouldn't take any stock until Mr. Stout returned; but he was willing the land should go in, if Gunn was willing. I knew Gunn was willing; because he had told me he had got a contract on the land."

Jasper Fortney testified:

"Q. I will ask you if you did survey at any time that land described in that plat. A. I did.

"Q. What did you do down there?. A. Surveyed the land; laid it off into lots and blocks, and marked the corners of the blocks with stones, and some of the intermediate lines to the streets, I think.

"Q. Who asked you to do that? A. I think the first said to me about it was said by Mr. Durkee; and he, if I am correct in my remembrance, referred me to Mr. Gunn. They— Gunn and Marr—made the contract with me. Mr. Gunn was the man who paid me for the work.

"Q. You drew a plat of it, did you? A. I did.

"Q. And furnished it to Mr. Gunn? A. No; I think I left the plat with Mr. Durkee—that is my remembrance now; I may be in error.

"Q. Did you ever see a copy of it hanging up in Gunn & Marr's office? A. My recollection is I marred the first plat by spilling a bottle of ink over it; and I think I made them two; and I think I saw the spoiled one in Gunn & Marr's office, and I think they had one placed on file—I don't know."

Mr. Gunn, upon being recalled, testified:

"Q. If after the dissolution of the firm of Gunn & Marr you had any talk with Mr. Durkee in regard to the sale of any of this land south of the avenue, on the western portion, you may state what the conversation was. A. I don't know as I ever had any talk with Durkee; I did with Mr. Stout. Mr. Stout told me two or three different times, when we happened to be talking, that whenever we got over to that side he would credit with the sale he made to Mr. Cross—that is, he would credit it up with mine.

"Q. Did you understand from Mr. Stout that some of this land had been sold to a man by the name of Cross? A. Yes, sir, I knew it had.

"Q. How do you know it; and what were the circumstances? A. Well, Mr. Steen came to me and told me he was trying to sell him something in Tower Hill addition, and he was favorably impressed with some of that land out there, and he was given half of the commission to sell it. I told him I would do it. Mr. Stout sold the land to Mr. Cross—two or three acres.

"Q. What did Mr. Stout tell you in regard to what he would do? A. He said I would be allowed that sale on the contract that he and I had. I talked with him two or three times that he told me that, just as we would speak of it during the fall.

"Q. That talk with Mr. Stout was after the dissolution of the partnership? A. Yes, sir.

"Q. What conversation did take place about the Tierman

matter? A. Well, he said to sell the land at $750 an acre; and I didn't want to. I thought it ought to bring more money; but I conceded that I ought to sell it, as I had the commission contract, and the land was his. He thought this boom might not last long, and I thought it would be worth more after awhile. I protested that it was not enough for the land. I had the commission contract on the land."

Mr. J. A. Durkee, one of the defendants, testified:

"Q. Well, up to the time that he came to report this, you had never told him he was not your agent, and you didn't want him to hold this land for sale any longer; until he came to report this sale? A. No, sir.

"Q. You took the *Monitor?* A. Yes, sir.

"Q. You saw these notices along? A. I never noticed more than one or two advertisements.

"Q. Wasn't it the Durkee & Stout property; you knew that was yours? A. Yes, sir.

"Q. And knew that was your property that you had put in his hands June 1st? A. I knew we had property right there; but I supposed he would advertise it as Durkee & Stout's addition.

"Q. You knew the Margrave extension across National avenue; it had got to go on to the Durkee & Stout land, that you had contracted to Dunn & Marr last year? A. Yes, I knew that.

"Q. You read the advertisements of the Durkee & Stout land? A. Yes, sir.

"Q. Did you go to Gunn & Marr and complain that as a matter of fact he was not pushing this land for sale? A. No, sir.

"Q. You were dissatisfied because he didn't sell; and immediately on his first sale you were dissatisfied, and revoked the contract? A. I don't see anything that he had done. I saw a few little squibs in the *Monitor;* that was all. I supposed the long time that the contract had run that he had thrown up the contract.

"Q. Didn't the contract have from February to October to run? A. Yes, sir."

Mr. Stout testified:

"Q. When was the first time you ever stated to Mr. Gunn that you didn't recognize him as your agent in regard to this property, and that his right was forfeited under this contract,

and you were no longer bound by it? A. It was about the first of February, when I returned from the East.

"When you returned from the East, you found there had been a great increase in the values and activity of sales in Fort Scott property? A. Yes, sir."

Mr. Gunn, upon being again recalled, testified:

"Q. In regard to the conversation that he testified to when the Tierman sale was reported, I will ask you whether or not anything was said at that time by him in regard to not recognizing that contract. A. No, sir. He said nothing about not recognizing my contract at the time.

"Q. Do you remember what day the meeting was held to organize the syndicate here in Fort Scott—this investment company? A. It was New Year's night. I know it was New Year's night, because there was a party at Eli Kearns's, and I went from the Huntington House to that party.

"Q. Where was it held? A. At the Huntington House."

The foregoing extracts fully sustain the findings of the trial court, and also show that Durkee & Stout had knowledge of the dissolution of the firm of Gunn & Marr, and recognized the transaction whereby Gunn assumed the business of the old firm and carried on the business of the old firm. And also, the foregoing extracts show that Mr. Durkee, of the firm of Durkee & Stout, had personal knowledge of the advertisements and notices published by Gunn, in relation to the sale of the land belonging to Durkee & Stout.

Notice to one partner of the firm is notice to all. The motion for rehearing must therefore be denied.